L. LEE PHILLIPS (SBN: 35694)
lphillips@manatt.com
JOHN M. GATTI (SBN: 138492)
jgatti@manatt.com
ERIC CUSTER (SBN: 166533)
ecuster@manatt.com
Manatt, Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, California 90064-1614
Telephone:   (310) 312-4000
Facsimile:    (310) 312-4224

MARK S. LEE (SBN: 94103)
mark.lee@rimonlaw.com
RIMON, P.C.
2029 Century Park East, Suite 400N
Los Angeles, CA   90067
Telephone/Facsimile: (310) 361-5776
Attorneys for Plaintiff STEPHEN PERRY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN PERRY, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PHIL BROWN, an individual,<br><br>Defendant. | Case No. 2:18-cv-9543<br><br>**EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE A PRELIMINARY INJUNCTION; MEMORADUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF STEPHEN PERRY, MARK S. LEE AND ERIC CUSTER IN SUPPORT THEREOF**<br><br>Date:  November __, 2018<br>Place: Courtroom of the Hon. |

TO DEFENDANT PHIL BROWN AND HIS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that plaintiff Stephen Perry ("Plaintiff" or "Perry") applies ex parte for a temporary restraining order and order to show cause for a preliminary injunction barring Defendant Phil Brown ("Defendant" or "Brown") and all those acting on his behalf from (1) using Perry's registered trademark, name or likeness to promote Brown, Brown's band, Brown's music, or a CD Brown claims to be planning to release, and (2) releasing any of Perry's vocal performances recorded at Brown's home or anywhere else.

This Application is made pursuant to Federal Rule of Civil Procedure 65 on the grounds that Defendant has, without Perry's permission, used Perry's registered mark "Steve Perry" and Perry's likeness to promote Brown and his band, causing irreparable harm to Plaintiff in violation of his Lanham Act and publicity rights. This application is made on the further ground that Brown's threatened release of Perry's recorded vocal performances would violate Perry's exclusive copyrights in his recorded vocal performances and irreparably harm Perry.

This Application is based on the concurrently filed Amended Complaint, the Memorandum of Points and Authorities and Declarations of Stephen Perry, Mark S Lee and Eric Custer, the exhibits filed concurrently with this Application, and upon such other and further evidence and things as may be presented at any hearing on this Application.

DATED:  November 13, 2018          Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP
RIMON P.C.


By: /s/ Mark S. Lee
   Attorneys for *Plaintiff*
   STEPHEN PERRY

-1-

# TABLE OF CONTENTS

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 2

    I.     PLAINTIFF .................................................................................... 2

    II.    DEFENDANT PHIL BROWN AND HIS MISCONDUCT ............... 3

ARGUMENT ....................................................................................................... **7**

    I.     DEFENDANT SHOULD BE ENJOINED FROM INFRINGING (1)
          PLAINTIFF'S NAME AND LIKENESS RIGHTS, AND (2)
          PLAINTIFF'S COPYRIGHT IN HIS RECORDED VOCAL
          PERFORMANCES ................................................................................. 7

        A.    Plaintiff Is Likely To Prevail On The Merits Of His Lanham Act False
             Association Claim ........................................................................... 7

             1.    Defendants' Actions Are Likely to Cause Confusion ............ 7
             2.    Plaintiff's Mark Is Strong ..................................................... 8
             3.    Defendants Are Using Perry's Name and Likeness ............... 8
             4.    There Is A Proximity of "Goods" and "Marks" .................... 9
             5.    Similar Marketing Channels Are Used ................................. 9
             6.    There Is a Low Degree of Consumer Care ........................... 10
             7.    Actual Confusion Is Not Needed .......................................... 10
             8.    Defendants' Conduct Is Intentional ..................................... 10
             9.    The Parties Are Already Operating in the Same or Similar
                 Product Lines ...................................................................... 11

        B.    Plaintiff Is Likely To Prevail On the Merits of His Declaratory Relief
             Claim that He Is The Sole Owner of His 1991 Vocal Performances ... 11

        C.    Plaintiff Is Likely To Prevail On The Merits Of His California
             Common Law Right Of Publicity Claim ........................................... 14

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

D.   Plaintiff Is Likely To Prevail On The Merits Of His California Statutory Right Of Publicity Claim ......................................................15

E.   Perry Will Suffer Irreparable Harm If An Injunction Does Not Issue  16

   1.   Actual Harm Will Continue Unless an Injunction Issues ......16
   2.   Actual Harm Will Occur Unless an Injunction Issues ...........17

F.   The Balance Of Hardships Favors Plaintiff ..........................................18

G.   The Public Interest Favors An Injunction ............................................18

II.   THIS COURT SHOULD IMMEDIATELY RESTRAIN DEFENDANTS FROM VIOLATING PLAINTIFF'S RIGHT **..........**19

III.   THIS COURT SHOULD NOT REQUIRE PERRY TO POSE A BOND ....................................................................................................20

IV.   CONCLUSION ....................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aalmuhammed v. Lee*,
　202 F.3d. 1227 (9th Cir. 2000) ................................................................ 12

*Academy of Motion Picture Arts & Sciences v. Creative House*
　*Promotions, Inc.*,
　944 F.2d 1446 (9th Cir. 1991) ................................................................ 10

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
　457 F.3d 1062 (9th Cir. 2006) ................................................................ 10

*Blackwelder Furniture* Co. *v. Seilig Manufacturing Co.*,
　550 F.2d 189 (4th Cir. 1977) ................................................................ 19

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*,
　174 F. 3d 1036 (9th Cir. 1999) ............................................................ 8, 9

*Consumer Health Information Corp. v. Amylin Pharmaceuticals, Inc.*,
　819 F. 3d 992 (7th Cir. 2016) ................................................................ 13

*Dr. Seuss Enterprises, LP v. Penguin Books USA, Inc.*,
　109 F.3d 1394 (9th Cir. 1997) ........................................................... 9, 10

*Entrepreneur Media, Inc. v. Smith*,
　279 F.3d 1135 (9th Cir. 2002) ................................................................. 9

*Erickson v. Trinity Theatres*,
　13 F.3d 1061 (7th Cir. 1994) ................................................................ 12

*Fastcase, Inc. v. Lawriter, LLC*,
　--- F.3d ---, 2018 WL 5318148 (11th Cir. October 28, 2018) ............................... 14

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
　778 F.3d 1059 (9th Cir. 2015) ................................................................. 7

*Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*,
　2013 WL 5200175 (N.D. Cal. Sept. 16, 2013) ...................................................... 17

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
　915 F. Supp. 2d 1138 (C.D. Cal. 2012) ...................................................... 18

*Goto.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ........................................................................ 10

*Interstellar Starship Services, Ltd. v. Epix, Inc.*,
    304 F.3d 936 (9th Cir. 2002) .......................................................................... 10

*Kalologie Franchising LLC v. Kalalogie Skincare Medical Group of California*,
    2014 WL 953442 (C.D.Cal 2014) ................................................................... 16

*Kelly v. Primco Management*,
    2015 WL 10990368 (C.D. Cal. 2015) ....................................................... 17, 18

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ............................................................................ 7

*Miss World (UK) Limited v. Mrs. Am. Pageants, Inc.*,
    856 F.2d 1445 (9th Cir. 1998) .......................................................................... 8

*Motschenbacher v. R.J. Reynolds Tobacco Co.*,
    498 F. 2d 821 (9th Cir. 1974) ......................................................................... 14

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010) .................................... 14

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) .......................................................................... 18

*Robinson v. Delicious Vinyl Records Inc.*,
    2013 WL 3983014 (C.D. Cal. Aug. 1, 2013) .................................................. 16

*Seven Arts Filmed Entertainment Limited v. Content Media Corp. PLC*,
    733 F.3d 1251 (9th Cir. 2013) ........................................................................ 13

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998) ........................................................................... 12

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) ......................................................................................... 7

*Waits v. Frito-Lay, Inc.*,
    978 F.2d 1093 (9th Cir. 1992) ........................................................................ 14

*Wendt v. Host Intern., Inc.*,
    197 F.3d 1284 (9th Cir. 1999) ........................................................................ 14

*Wendt v. Host* Intern.,
    *supra*, 125 F.3d 805,812 ......................................................................... 8

*Wendt v. Host Intern.*,
    *supra*, 125 F.3d at 812 ...................................................*passim*

*White v. Samsung Electronics America, Inc.*,
    971 F.2d 1395 (9th Cir. 1992) ...............................................*passim*

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................. 7

*Zuill v. Shanahan*,
    80 F.3d 1366(9th Cir. 1996) ....................................................... 13

**Statutes**

15 U.S.C. §§ 1114(a), 1125(a) .................................................................. 7

17 U.S.C. §202 ........................................................................................ 11

17 U.S.C. §512(g)(2)(B) ........................................................................... 6

19 U.S.C. §101 ........................................................................................ 12

Cal. Civil Code § 3344(a) ....................................................................... 15

**Other Authorities**

Fed.R.Civ.P. 65(b) ......................................................................... 19, 20

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Stephen Perry, professionally known as "Steve Perry" ("Plaintiff" or "Perry") is a well-known songwriter, and musician, and former lead singer of the internationally known and rock band and Roll Hall of Fame inductee "Journey." He has just released a solo album to great success. Defendant Phil Brown ("Brown") is a musician who, after Perry's recent successful solo release, began misleadingly associating himself with Perry, falsely implying that Perry is a member of Brown's band, and threatening to release certain decades-old vocal performances of Perry that were never intended for public release.  Brown makes these threats even though Perry owns all intellectual property rights in said vocal performances, Brown abandoned any claim to those recordings years ago, and Perry has demanded that Brown not release them because such an unauthorized release of Perry's intellectual property will cause Perry irreparable harm.

Brown has ignored Perry's demands. He instead continues to misleadingly advertise his music as being associated with Perry, and actually posted a 35-second clip from one of Perry's recorded vocal performances on Facebook and repeatedly threatened to release Perry's recorded vocal performances in the face of Perry's demands that he not do so.

Perry does not want his name, likeness and vocal performances used to promote Brown, and does not want those decades-old recorded vocal performances released because they were never intended for public consumption.  Perry requests immediate injunctive relief to stop Brown from using Perry's name or likeness to promote Brown's music or for any other commercial purpose, and to prohibit Brown from distributing his vocal performances recorded in Brown's home or anywhere lese, or any part of them, in any manner during the pendency of his action.

# STATEMENT OF FACTS

## I. PLAINTIFF

Plaintiff Steve Perry is an American singer and songwriter. Best known as the former lead singer of the rock band "Journey" during that group's most commercially successful periods from 1977 to 1987, and 1995 to 1998, Perry co-wrote a number of the band's greatest hits, including "Don't Stop Believin,'" "Who's Crying Now," and "Open Arms," "Separate Ways," "Any Way You Want It," and others. (Concurrently filed Declaration of Steve Perry ["Perry Decl."] ¶2.) Perry recorded seven albums with "Journey," which has sold about 54 million albums and singles in the U.S. and an estimated 75 million worldwide. Declaration of Mark S. Lee ["Lee Decl."] ¶ 2.) On April 7, 2017, Perry was inducted into the Rock and Roll Hall of Fame as a member of "Journey." (Perry Decl. ¶2.)

Perry also has had a successful solo career. In 1984 he released his first solo album, "Street Talk" which features the hit singles "Oh Sherrie" and "Foolish Heart," on CBS Records. That album has been certified "Platinum" by the Recording Industry Association of America ("RIAA"). In 1994 Perry released a second solo album, "For the Love of Strange Medicine," that featured the hit "You Better Wait" and was certified "Gold" by the RIAA. (Perry Decl. ¶¶ 3-4.)

Most recently, following an extended hiatus, Perry on or about October 5, 2018 released a third solo album, entitled "Traces." (Perry Decl. ¶ 5.) That solo album has already reached Number 6 on the "Billboard 200" chart, signifying that it was the sixth most popular music album in the U.S. during week of its release, and a single from the album "No Erasin'," reached No. 18 on Billboard's "Adult Contemporary" Chart. (Id.) There has been substantial publicity surrounding Perry and his "Traces" album before and since its release. (Perry Decl. ¶ 6; Lee Decl. ¶¶ 4 and 5, Exhs. I and J.)[1]

_____

[1] In this Ex Parte Application, Exhibits A through G are designated in the same

As a result of his professional efforts and success, Perry, and his name, likeness and identity have become well known to the consuming public.  The U.S. Patent and Trademark Office has awarded Plaintiff a trademark registration for "Steve Perry" in connection with prerecorded music and other related services. (Lee Decl. ¶10 and Exh. A.)  To illustrate the extent of that fame, a Google search of his name reveals 284 million entries.  (Lee Decl. ¶ 4; Exh. I.)  Perry's unique singing voice and vocal style have become instantly recognizable to the public, and have garnered acclaim from prominent musical peers and publications.  Among other accolades, he was dubbed "The Voice" by fellow rock musician Jon Bon Jovi, and was ranked No. 76 on "Rolling Stone" magazine's "100 Greatest Singers of All Time" chart. (Lee Decl. ¶¶  6 and 7; Exh. K.)

Due to the recognizability of his vocal performances, a public release of a subpar recording or subpar vocal performance could adversely impact the public's perception of Perry as a vocalist, musician and performer.  Perry is very particular about the music and recordings of his vocal performances he chooses to release in these circumstances, and he does not release recorded music unless he believes that music, his vocal performance of the music, and the quality of the recording of his vocal performances, meet his standards. (Perry Decl. ¶ 7.)

## II.   DEFENDANT PHIL BROWN AND HIS MISCONDUCT

Defendant Phil Brown is a musician. In about 1991, Perry was introduced to Brown by his manager Bob Cavallo and encouraged to work with Brown to see if worthwhile music could be created.  Perry did so. (Perry Decl. ¶ 8.)

Brown showed Perry two songs Brown had written during that time, and Perry wrote two songs with Brown in Brown's home in Sylmar, California.  To evaluate the songs, Perry recorded vocal performances of them on an eight track tape recorder Brown had in his garage. (Perry Decl. ¶ 9.)  Perry loaned Brown

order as they are in the concurrently filed First Amended.  Subsequent Exhibits are designated in the order in which they appear in this brief.

$1,500 for the use of Brown's garage and eight track tape recorder to record those performances, as described in an administration agreement Brown signed in favor of Perry in August 1991.  (Id.)

These recordings were made exclusively for "demo" purposes, to see if Perry could make something of the songs that was creatively acceptable to him. Perry never intended these recordings for public release, and never authorized them for public release or performance. These home recordings did not have the same sonic quality as a studio recording, and while Perry's vocal performances were rendered well enough for Perry to evaluate whether he wanted to do anything with the songs, he did not perform them as he would have if he were recording a studio performance for public release. Neither those recordings nor those vocal performances met or meet his standards for public release. (Perry Decl. ¶ 10.)

Given the rudimentary nature of the recording environment, Perry also never intended those recordings of his vocal performances to form a part of a larger sound recording in which Brown or anyone else would have a copyright interest. Instead, Perry at all times intended to, and did, keep sole copyright ownership of the vocal performances recorded at Brown's home.  (Perry Decl. ¶¶ 11-12.)  Perry had that intent because, among other things, he was contractually required to release all of his recorded vocal performances exclusively through CBS Records, which was subsequently acquired by Sony.  (Perry Decl. ¶ 11.) Perry could not give any third party, including Brown, a right to release Perry's recorded vocal performances when he was signed to CBS/Sony Records. (Id.) Although the terms of Perry's recording agreement are confidential, a redacted version which shows the provisions that barred Perry from releasing recorded vocal performances for anyone else is attached as Exhibit "B."  (Perry Decl. ¶ 11; Exh. B.) When recording vocal performances at Brown's home, Perry at all times intended to comply with these contractual obligations by retaining copyright in his vocal performances, specifically so that he could control and prevent the unauthorized release of those home recordings by

1    others.  (Perry Decl. ¶¶ 11-12.)

2          To further extend Perry's control over the musical compositions he created

3    with Brown, Perry and Brown signed an exclusive administration agreement

4    pursuant to which Perry would control exploitation of their two musical

5    compositions, "Somebody Somewhere" and "Don't Push The River," as set forth in

6    that administration agreement.  (Perry Decl. ¶13 and Exh. C.)

7          Perry ultimately decided that the musical compositions he and Brown worked

8    on were not appropriate for public release by him.  (Perry Decl. ¶ 14.)  None of the

9    musical compositions he created with Brown, and none of the vocal performances

10   he rendered in Brown's garage in 1990 and 1991, appeared on the 1994 "For the

11   Love of Strange Medicine" album.  Perry did no additional work with Brown.  (Id.)

12         However, in 2002 Brown though his attorney claimed for the first time that

13   Brown had an interest in Perry's 1991 recorded vocal performances, and Brown

14   threatened to release them. (Perry Decl. ¶15; Concurrently filed Declaration of Eric

15   Custer ["Custer Decl."] ¶ 2 and Exh. D.) Perry through his counsel expressly

16   repudiated Brown's claim to a copyright interest in Perry's recorded vocal

17   performances in a letter dated February 7, 2002, which reasserted Perry's sole

18   ownership of those recorded vocal performances (Custer Decl. ¶ 2 and Exh. E.)

19   After receiving Perry's letter, Brown did not release those recorded vocal

20   performances, and he never took legal action to dispute Perry's sole copyright

21   ownership of his recorded vocal performances. Indeed, Brown never disputed

22   Perry's copyright ownership of those recorded vocal performances in any other way

23   for fourteen years. (Perry Decl. ¶15.)

24         Perry released his "Traces" album on or about October 5, 2018 to widespread

25   success as described above. Considerable publicity attended that release.  (Perry

26   Decl. ¶¶ 5 and 6; Lee Decl. ¶ 5 and Exh. J.)

27         Four days later, on or about October 9, 2018, Brown through his

28   representatives again began claiming an ownership interest in Perry's vocal

-5-

performances recorded in Brown's home, and again threatened to release those performances to the public against Perry's wishes. Brown's manager, one Brenda Bann, began circulating Twitter messages promoting the imminent release of Brown's and his band's new CD in a way that misleadingly makes it appear that Perry is in Brown's band. For example, on October 23, 2018, Ms. Bann tweeted that "BROWN"S NEW CD's almost completed! The NEW band APACHES FROM PARIS is coming together with OUTSTANDING musicians who are well known in the music world! There is an extra little treat in the works for those of you who like Steve Perry!" (https://twitter.com/BrendaBann; Custer Decl. ¶ 4; Exh. F.)

Bann's next tweet on behalf of Brown, sent on October 31, 2018, featured an image of Perry next to an image of Brown, with the Text "PHIL BROWN OF LITTLE FEAT! STEVE PERRY OF JOURNEY! FIRST SONG RELEASE COMING SOON!!" (https://twitter.com/BrendaBann; Custer Decl. ¶ 4; Exh. F.) Bann's tweets throughout the month of October have threatened the imminent release of Perry's 1991 vocal performances misleadingly packaged as authorized by Perry, even though Perry's representatives repeatedly demanded that Brown cease and desist all such efforts. (Id.)

On or about November 1, 2018 Brown posted a 35 second clip from one of Perry's vocal performances on a Facebook webpage promoting Brown and his band "Apaches From Paris." (Lee Decl. ¶ 8; Exh. G.) Perry sent a DMCA takedown notice after that posting was discovered, and Facebook deleted the posting on or about November 9, 2018. (Lee Decl ¶ 8.) However, Brown can seek to have the video reposted by filing a counter-designation, and if Brown does that, Facebook will be required to repost it absent legal action. See 17 U.S.C. §512(g)(2)(B).

Perry never approved, authorized, or acquiesced in Defendants' use of his name to promote Brown, Brown's musical services, or Brown's CD's in the manner described above. (Perry Decl. ¶ 17.) To the contrary, Plaintiff has repeatedly and consistently demanded that Brown immediately cease and desist from all uses of his

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

name, image, and performance, and has repeatedly asserted Perry's sole ownership of his 1991 recorded vocal performances and or confusingly similar renditions of his name.  (Custer Decl. ¶ 4; Exh. L.)

## ARGUMENT

## I.

## DEFENDANT SHOULD BE ENJOINED FROM INFRINGING (1) PLAINTIFF'S NAME AND LIKENESS RIGHTS, AND (2) PLAINTIFF'S COPYRIGHT IN HIS RECORDED VOCAL PERFORMANCES

This Court should enter a preliminary injunction against Defendant if Plaintiff demonstrates (1) a likelihood of success on the merits of his lawsuit; (2) a likelihood of irreparable harm absent a preliminary injunction; (3) that the balance of hardships favors Plaintiff; and (4) that an injunction would be in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009).  A preliminary injunction should issue under these standards for the reasons described below.

### A.   Plaintiff Is Likely To Prevail On The Merits Of His Lanham Act False Association Claim

#### 1.   Defendants' Actions Are Likely to Cause Confusion

The Lanham Act proscribes both trademark infringement and activity that is likely to cause confusion, mistake or deception as to the association, sponsorship or approval of goods or services by another.  15 U.S.C. §§ 1114(a), 1125(a).  The key inquiry in both cases is whether an appreciable number of consumers are "likely to be deceived or confused by the similarity of the marks."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992).  In celebrity endorsement such as the present one, likelihood of confusion is determined by weighing eight "factors" articulated by the Ninth Circuit. *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015).  However, "it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors," and a court "should not exercise excess rigidity in applying them."

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F. 3d 1036, 1054 (9th Cir. 1999).

Here, relevant factors strongly favor a finding of a likelihood of confusion as discussed below.

### 2.    Plaintiff's Mark Is Strong

Plaintiff's registered mark is his professional name "Steve Perry," and his "mark" in connection with his false association claim mark is broader. In a celebrity false association case such as this one, one's "mark" means a celebrity's persona, while the "strength of the mark refers to the level of recognition the celebrity enjoys among members of society." *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992); *Wendt v. Host* Intern., *supra*, 125 F.3d 805,812 and n.1 (9th Cir. 1997)

Here, Perry is one of the best known and most recognizable rock musicians in the United States.  His registered "Steve Perry" mark is now incontestable, and a Google search reveals over 284 million entries for his name, while he has co-written and sung songs that have sold more than 50 million copies and remained popular for over 35 years, becoming anthems to many Americans.  Plaintiff's name is a "strong" mark in these circumstances, certainly as strong as those celebrities that the Ninth Circuit has held to have strong marks, such as George Wendt, John Ratzenberger, or Vanna White.  *See Wendt v. Host Intern.*, *supra*, 125 F.3d at 812 (Wendt's and Ratzenberger's "marks" are strong because of their fame from the "Cheers" television series); *White*, *supra*, 971 F.2d at 1400 (Vanna White's "mark," *i.e.*, her celebrity identity, is strong because she is well-known as the hostess of "Wheel of Fortune," and she enjoys a high level of recognition in society).

### 3.    Defendants Are Using Perry's Name and Likeness

Similarity of marks is determined by evaluating their "sight, sound and meaning." *Miss World (UK) Limited v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445,

-8-

1450 (9th Cir. 1998). "[T]he more similar the marks are in terms of appearance, sound and meaning, the greater the likelihood of confusion." *Brookfield Communications*, *supra*, 174 F.3d at 1054.

Here, Brown is literally using Perry's exact mark and likeness. This factor weighs heavily in favor of likely confusion. *Dr. Seuss Enterprises, LP v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404-05 (9th Cir. 1997) (substantial similarity between plaintiff's marks and defendant's infringing marks—"Dr. Seuss" and "Dr. Juice," respectively— favor likelihood of confusion).

### 4.    There Is A Proximity of "Goods" and "Marks"

"In cases concerning confusion over celebrity endorsement, the plaintiff's 'goods' concern the reason for or source of the plaintiff's fame." *White*, *supra*, 971 F.2d at 1400. Here, Plaintiff is famous because of his decades-long successful music career and accomplishments. Brown uses Perry's mark, name and likeness for precisely that purpose, to compete with Perry while misleading the public into believing that Perry is associated with Brown's band, or at least authorizes Brown's use of Perry's vocal performance. This establishes that the goods and marks are "closely related" to the "reasons for or source of" the public's awareness of Plaintiff. *White*, *supra*, 971 F.2d at 1400 (source of Vanna White's fame, *i.e.*, television program, was "closely related" to defendant's VCR product); *Wendt v. Host Intern.*, *supra*, 125 F.3d at 812-13 ("Cheers" actor's fame "obviously" related to defendant's bar services).

### 5.    Similar Marketing Channels Are Used

Marketing services through the same channels favors a likelihood of confusion. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002). Here, both Perry's music and Brown's music are being marketed through Facebook. (Lee Decl. ¶ 11; Custer Decl. ¶ 4; Exh. G.) Significant use of similar internet marketing channels favors a likelihood of confusion determination.

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

*Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002); *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1201 (9th Cir. 2000).

### 6.   There Is a Low Degree of Consumer Care

"[C]onsumers are not likely to be particularly careful in determining who endorses" products or services, "making confusion as to their endorsement more likely." *White*, *supra*, 971 F.2d at 1400; *Wendt v. Host Intern.*, *supra*, 125 F.3d at 813.

### 7.   Actual Confusion Is Not Needed

Actual confusion is not needed to issue a preliminary injunction for a Lanham Act violation. *Dr. Seuss Enterprises, LP v. Penguin Books USA, Inc.*, *supra*, 109 F.3d at 1405 (affirming preliminary injunction even though no evidence of actual confusion was presented). This is so "because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make[] its absence generally unnoteworthy." *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006). Here, Defendants have been using Plaintiff's mark on their website for only a short time, and thus the "absence" of actual confusion evidence is especially "unnoteworthy." *Au-Tomotive Gold, Inc.*, *supra*.

### 8.   Defendants' Conduct Is Intentional

Brown here obviously did not "accidentally" copy Perry's name and likeness to promote Brown, Brown's musical group or Brown's music. Brown's obvious intent is to free-ride off the goodwill associated with Perry and his recent musical success with "Traces" to divert consumers to Brown and his music. Defendants' knowing adoption of a mark similar to Plaintiff's creates a presumption of intentional infringement. *Wendt v. Host Intern.*, *supra*, 125 F.3d at 813 (inference of intent present because defendants knowingly adopted a mark similar to plaintiff's); *Academy of Motion Picture Arts & Sciences v. Creative House*

-10-

*Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (presumption of intentional infringement arises when defendant deliberately adopts plaintiff's mark to obtain advantage from plaintiff's goodwill.)

### 9. The Parties Are Already Operating in the Same or Similar Product Lines

Although the Ninth Circuit once stated that this element does not apply to cases involving questions of celebrity endorsement, *White*, *supra*, 971 F.2d at 1401, it later recognized that this element could in fact favor a finding of likelihood of consumer confusion in this setting. *See Wendt v. Host Intern.*, *supra*, 125 F.3d at 814 (fact that celebrity was likely to endorse similar products or services in the future indicated likely expansion of product lines and thus supported a likelihood of confusion determination).

Here, Perry and Brown already operate in the same product line, namely popular music, and in one common geographic market, *i.e.*, the United States.  This factor also supports a finding of likely confusion.

The likely confusion evidenced by the above favors entry of preliminary injunctive relief in Perry's favor.

### B. Plaintiff Is Likely To Prevail On the Merits of His Declaratory Relief Claim that He Is The Sole Owner of His 1991 Vocal Performances

Perry is likely to prevail on his declaratory relief claim that he is the sole owner of the copyright in his recorded vocal performances, and that any release of those performances by Brown would infringe Perry's copyrights.  Brown's recent copyright co-ownership claims lack merit for many reasons.

First, Brown's possession of the physical recordings of Perry's vocal performances gives him no rights in the copyright of Perry's performances under the plain language of the Copyright Act.  "Ownership of a copyright… is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. §202.

Thus, Brown's ownership of the physical tapes in which Perry's vocal performances are embodied has nothing to do with ownership of the copyright in Perry's vocal performances. Instead, copyright ownership must be determined by the principles of copyright law.

Second, Perry's recorded vocal performances could never constitute a "joint work" in which Brown would co-own a copyright interest under applicable principles of copyright law, because Perry never intended his vocal performances to become part of a joint work with Brown. (Perry Decl. ¶¶ 11 and 12.) Brown lacked such intent because, as described above, he could not give any third party a right to release recordings of his vocal performances while he was signed to CBS/Sony. (Id; Exh. B.)

The recordings of Perry's vocal performances are not a "joint work" in these circumstances. To qualify as a "joint work," a work must be "prepared by two or more authors with the intention that their contributions [will] be merged into inseparable or interdependent parts of a unitary whole." 19 U.S.C. §101 (definition of "joint work"). Lack of such intent is fatal to Brown's joint authorship claim even if Brown contributed protectable elements to such a "work." Many courts have held that individuals who contribute protectable expression to a work are not joint authors of a joint work when the mutual intent to create a joint work is lacking. See *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000) (contributor to "Malcom X' motion picture not a joint author because defendant did not intend the film to be a joint work); *Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998) (contributions to play did not make plaintiff a joint author because defendant never intended the play to be a joint work); *Erickson v. Trinity Theatres*, 13 F.3d 1061 (7th Cir. 1994)(same).

Third, Brown lost whatever right he ever had to claim joint ownership of Perry's recorded vocal performances when he failed to act after Perry expressly repudiated Brown's co-ownership claim in February 2002. "Copyright claims premised on disputes about ownership accrue when plain and express repudiation of

co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." *Consumer Health Information Corp. v. Amylin Pharmaceuticals, Inc.*, 819 F. 3d 992, 996 (7th Cir. 2016) (internal quotations omitted)( suit to recover copyright grant barred because plaintiff waited seven years to file suit); *Seven Arts Filmed Entertainment Limited v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (plaintiff's delay of more than three years barred copyright ownership claims); *Zuill v. Shanahan*, 80 F.3d 1366, 1369-71(9th Cir. 1996)( claim to ownership of copyright barred by statute of limitations because plaintiff waited more than three years after defendant repudiated Plaintiff's ownership to file suit).

Here, Perry expressly repudiated Brown's claim to co-ownership of Perry's recorded vocal performances no later than February 2002, when Perry's counsel advised, in writing, that Brown had no such interest and that Perry was the sole copyright owner of those vocal performances. (Custer Decl. ¶   and Exhs. D and E.) Brown's failure to dispute Perry's claim within three years after Perry expressly repudiated Brown's claim, or by no later than February 2005, conclusively quiets title in Perry's vocal performances in Perry, and bars Brown from claiming a copyright interest in Perry's recorded vocal performances now or in the future under the authorities cited above.

Thus, Perry is likely to prevail on his claim to sole ownership of copyright in his recorded vocal performances. Brown's repeated threats to release those performances without Perry's permission, and his actual posting of a clip of one of those performance on Facebook, demonstrates that Brown is willing to infringe and will infringe Perry's rights in his vocal performances if Brown is not restrained by this Court, causing irreparable harm to Perry as described below.  This further supports entry of a preliminary injunction.[2]

---

[2] Although Perry has not been able to register his vocal performances with the

**C.    Plaintiff Is Likely To Prevail On The Merits Of His California Common Law Right Of Publicity Claim**

California recognizes a common law right of publicity that protects individuals from the unauthorized commercial exploitation of their identities by others.  Defendants violate an individual's common law right of publicity when they (1) use the Plaintiff's identity; (2) to Defendants' commercial or other advantage; (3) without consent; and (4) cause injury.  *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1397 (9th Cir. 1992), citing *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 417 (1983).  The Ninth Circuit has recognized that virtually any evocation of an individual's identity for commercial purposes can violate one's right of publicity.  *See Wendt v. Host Intern., Inc.*, 197 F.3d 1284 (9th Cir. 1999) (use of animatronic robots at an airport bar improperly invoked the identities of two actors from the television series "Cheers"); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) (use of "sound-alike" singer in commercial violated Tom Waits' California common law right of publicity); *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395 (9th Cir. 1992) (use of a robot on a game show set, turning letters, violated Vanna White's common law right of publicity); *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F. 2d 821 (9th Cir. 1974) (use of race car driver's

_____

Copyright Office because Brown has custody of their physical recordings, this Court has subject matter jurisdiction to decide this copyright issue. The Supreme Court has made clear that the Copyright Act's registration requirement does not deprive this Court of subject matter jurisdiction to decide issues that "arise under" the Copyright Act.  *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157, 130 S.Ct. 1237, 1241, 176 L.Ed.2d 18 (2010) (while § 411(a)'s registration requirement remains a "precondition to filing a claim," it "does not restrict a federal court's subject-matter jurisdiction.)  Thus, this Court can consider declaratory relief claims that require construction of the Copyright Act even when the works at issue have not been registered with the Copyright Office. *Fastcase, Inc. v. Lawriter, LLC,* --- F.3d ---, 2018 WL 5318148 (11th Cir. October 28, 2018) (reversing district court's dismissal of a declaratory relief action that required construction of the Copyright Act for lack of a copyright registration).

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

car in ad violated his right of publicity even though driver's face not visible because the public could identify him from his car).

Defendants have violated Perry's common law rights of publicity under these standards because, among other things:

1)      Brown is using Perry's name and likeness to promote Brown, Brown's band, and Brown's upcoming album, which will include sound recordings with which Perry has nothing to do.  (Custer Decl. ¶4, Exh. F.)

2)      Brown has misappropriated and is using Plaintiff's name and likeness for commercial purposes, namely, to promote music that directly competes with Perry.  (Id.)

3)      Brown is using Perry's identity without his consent.  (Perry Decl. ¶17.)

4)      Brown's actions are injuring and irreparably harming Perry by causing him to lose control over how his name is being used, by using it to promote a person and CD recording in which he has no interest and which is ostensibly in competition with Perry, by confusing and diverting consumers who could attribute their confusion to Perry, and by threatening to harm the goodwill that Plaintiff has carefully built up over a 40-year music career.  (Perry Decl. ¶ 18.)

Defendant should be immediately enjoined from engaging in further misconduct, and should remain enjoined during the pendency of this action, for these reasons.

**D.      Plaintiff Is Likely To Prevail On The Merits Of His California Statutory Right Of Publicity Claim**

A defendant infringes Plaintiff's statutory right of publicity when they "knowingly" use his "name, voice, signature, photograph [?], or likeness, in any manner . . . for the purposes of advertising or selling . . . products or services, without such person's prior consent."  Cal. Civil Code § 3344(a).

California's statutory right of publicity is narrower than the common law right of publicity because it requires that the defendant "knowingly" use the plaintiff's

"name, voice, signature, photograph or likeness," while the use of any other recognizable indicia of the plaintiff's identity are not covered by the statute. *Wendt v. Host Intern., Inc.*, supra, 125 F.3d at 811.  Defendant's conduct here nevertheless squarely violates the statute.  Defendant is "knowingly" using Plaintiff's name and likeness for commercial advantage to attract and divert consumers to Defendant, and to promote Defendant without Plaintiff's consent.  Defendant's use of Perry's name and likeness to launch a competing CD just after Perry successfully launched a solo album that generated significant publicity is obviously intended to free-ride off the goodwill associated with Perry and confuse the public into thinking that Brown's CD is somehow associated with Perry and his recent CD.  Brown's conduct is certainly intentional.

Here, Brown's actions violate Perry's statutory rights of publicity because Brown is knowingly and intentionally using Plaintiff's name for his commercial advantage, to confuse and divert consumers, and to promote sales of a purportedly competing business without Perry's consent.

**E.    Perry Will Suffer Irreparable Harm If An Injunction Does Not Issue**

**1.    Actual Harm Will Continue Unless an Injunction Issues**

Brown's actions have caused Perry to lose the ability to control his name and likeness by associating it with a person, music and band with which Perry does not wish to be associated, and over which he has no control.  That establishes irreparable harm that supports a preliminary injunction under relevant law.  "A plaintiff's loss of control over its business reputation resulting from a defendant's alleged unauthorized use of its protected mark during the pendency of an infringement action can constitute irreparable harm justifying injunctive relief." *Kalologie Franchising LLC v. Kalalogie Skincare Medical Group of California*, 2014 WL 953442, *5 (C.D.Cal 2014); *accord Robinson v. Delicious Vinyl Records Inc.*, 2013 WL 3983014, at *7 (C.D. Cal. Aug. 1, 2013) ("Courts have repeatedly

found that losing control of one's reputation and goodwill in the marketplace supports the issuance of an injunction.")

### 2.     Actual Harm Will Occur Unless an Injunction Issues

Defendant's actions also threaten to cause Plaintiff to lose the ability to control how his 1991 recorded vocal performances, which were never intended for public consumption, are exploited.  Given current technology, Defendant can, in minutes or hours, cause a release of Perry's recorded performances so widespread that Perry will never be able to retrieve them or stop their further unuthorized dissemination. (Lee Decl. ¶ 9.) Such harm is irreparable, and also supports entry of a preliminary injunction under applicable law.

*Kelly v. Primco Management*, 2015 WL 10990368, *13-14 (C.D. Cal. 2015), granted a preliminary injunction barring defendant's release of plaintiff's copyrighted sounding recordings without permission because, inter alia, releasing them before the copyright owning plaintiff did caused irreparable harm.  The court stated:

> Defendants' actions… releasing Ms. Kelly's sound recordings without giving her the ability to choose when and in what form she wished to do so (if ever) has damaged Ms. Kelly's goodwill with consumers by preventing [Ms. Kelly] from exercising control over the presentation of" her sound recordings, and deprived both [Ms. Kelly] and many others of revenue that will be impossible to calculate because there is no way of knowing how many people would have paid to [hear her songs] but for Defendants' infringement. *Id*; internal quotations omitted.

*Kelly* and other courts have also held that the inability to calculate the harm caused by such unauthorized recording release further demonstrates irreparable harm that supports a preliminary injunction. *Kelly*, supra, at *14; *Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*,  2013 WL 5200175, at *7 (N.D. Cal. Sept. 16, 2013) (finding irreparable harm based on difficulty in quantifying money judgment because it would be impossible to account for all infringing copies of copyrighted

-17-

software); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) ("The foregoing harms are irreparable because they are 'neither easily calculable, nor easily compensable.'" (quoting *Warner Bros.*, 824 F. Supp. 2d at 1013)).

Finally, it is well-established that harm to one's reputation, goodwill, or relationships—all of which may result from future copyright infringement—constitutes irreparable harm that supports entry of a preliminary injunction. *Kelly*, supra, at *14; s*ee Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (noting that damage to one's reputation or goodwill qualifies as irreparable harm because it is difficult to calculate,)

The irreparable harm Plaintiff is suffering and will suffer if Brown is not immediately restrained supports entry of a preliminary injunction.

## F.   The Balance Of Hardships Favors Plaintiff

Brown's infringing activities violate Perry's Lanham Act and publicity rights, and threaten to violate Perry's copyrights, causing injuries that are irreparable as described above.  In contrast, any inconvenience to Defendants will be economic, consisting primarily, if not entirely, of Defendants' having to stop and forego his illegal conduct.  "[A] defendant who knowingly infringes a [mark or copyright-protected work] cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."  Cadence Design Sys. v. Avant Corp., 125 F.3d 824, 829 (9th Cir. 1997).  Given "the probable outcome of this action, this is a loss which [Defendants] may justifiably be called upon to bear."  Corning Glass Works v. Jeannette Glass Co., 308 F. Supp. 1321 (S.D.N.Y. 1970), aff'd on the opinion below, 432 F.2d 784 (2d Cir. 1970).

## G.   The Public Interest Favors An Injunction

The public interest is furthered by issuance of a preliminary injunction in these circumstances.  One of the essential purposes of trademark law is to protect the consuming public from being misled as to the source of goods or services

purchased.   As the court in Corning *Glass Works* noted:

> While Plaintiff is injured when consumers purchase [Defendant's merchandise] believing it to be [Plaintiff's merchandise], consumers too are directly being victimized.  An injunction is thus in the public interest; only if the distribution of [Defendant's goods] is stopped can further fraud be avoided.
>
> *Corning Glass Works*, *supra*, 308 F. Supp. at 1328.

Here, Defendants' misleading and deceptive use of Plaintiff's name and likeness, and his threats to distribute Perry's vocal performances, could mislead and divert consumers who will believe they are hearing or are about to purchase music authorized by Perry, when they will instead be purchasing music offered by Brown, much of which has absolutely nothing to do with Perry.  The public interest is furthered by preventing such confusion.

In addition, the public interest is especially strong when a statute expressly forbids the conduct in question.  *Blackwelder Furniture* Co*. v. Seilig Manufacturing Co.*, 550 F.2d 189, 197 (4th Cir. 1977).  Defendant here has acted in flagrant disregard of both the Lanham Act and California right of publicity statutes, and has acted and threatens to further act in flagrant disregard of copyright law.

## II.
## THIS COURT SHOULD IMMEDIATELY RESTRAIN DEFENDANTS FROM VIOLATING PLAINTIFF'S RIGHT

In addition to describing the requirements for entry of a preliminary injunction, Federal Rule of Civil Procedure 65 permits issuance of an *ex parte* temporary restraining order when necessary to prevent "immediate and irreparable injury, loss or damage."  Fed.R.Civ.P. 65(b).  Plaintiff here has shown infringement, a high likelihood of confusion, and irreparable injury as described above.

Every day that Defendant is allowed to improperly associate himself with Perry, and every day he releases Perry's vocal performances further damages Plaintiff's goodwill and the excellence associated with Perry's music, while simultaneously confusing and deceiving the public regarding the origins of those

works.  The need for immediate restraint is even more pronounced in the present online environment, as Brown could, literally, release those recordings online in minutes.  Once released, given present social media realities, any such releases could "go viral" and spread to thousands, or millions, of Internet users in seconds, let alone the time needed to obtain a preliminary injunction on a noticed motion, making it impossible to obtain effective injunctive relief. (Lee Decl. ¶ 9.) An immediate temporary restraining order should be entered pending a hearing on Plaintiff's application for a preliminary injunction in these circumstances.[3]

### III.
### THIS COURT SHOULD NOT REQUIRE PERRY TO POSE A BOND

This Court has the discretion to require Perry to post a bond in connection with a TRO or preliminary injunction.  Fed.R.Civ.P. 65.  However, no such bond should be required here.  Brown has not released those recordings for at least 27 years, and will suffer little or no loss from an order that prevents him from releasing them during the brief period involving the pendency of this action.  This lack of harm mitigates against requiring a bond.

### IV.
### CONCLUSION

Plaintiff's ex parte application should be granted for all the reasons described above.

---

[3] In compliance with the local rules, Plaintiff has notified Defendants of the present application.  (Lee Decl. ¶ 10.)

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

1    DATED:  November 13, 2018          Respectfully submitted,

2                                       MANATT, PHELPS & PHILLIPS, LLP
                                        ERIC CUSTER
3                                       JOHN M. GATTI
                                        ERIC CUSTER
4

5                                       RIMON P.C.
                                        MARK S. LEE
6

7

8                                       By: /s/ Mark S. Lee
                                           _____
9                                          Attorneys for *Plaintiff*
                                           STEPHEN PERRY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-21-

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

## DECLARATION OF STEPHEN PERRY

I, Stephen Perry, declare:

1. I am the Plaintiff in this action. I have personal knowledge of the facts stated in this declaration except where otherwise indicated. If called upon as witness, I would and could competently testify thereto.

2. I am a professional singer, songwriter, and musician. From 1977 to 1987, and again from 1995 to 1998, I was a member of and the lead singer of the rock band "Journey." I co-wrote a number of songs with other members of "Journey" that became very popular, including "Don't Stop Believin," "Who's Crying Now," "Open Arms," "Separate Ways," "Any Way You Want It," and others. I recorded seven albums with Journey, which have sold millions of copies. On April 7, 2017, I was inducted into the "Rock & Roll Hall of Fame" as a member of Journey.

3. I also have pursued a solo musical career. In 1984, I released a solo album called "Street Talk" on CBS Records that featured two singles that became hits, "Oh Sherrie" and "Foolish Heart." "Street Talk" has been certified "Platinum" by the Recording Industry Association of America ("RIAA"), which means that the RIAA determined that it sold over a million copies.

4. In 1994, I released my second album, called "For the Love of Strange Medicine." That album featured the hit "You Better Wait," and has been certified "Gold" by the Recording Industry Association of America, which means that it sold over 500,000 copies.

5. I took an extended hiatus from music following the release of my second solo album and participation in Journey from 1995 to 1998. However, several years ago I began work on a third solo album called "Traces" that was released to the public on or about October 5, 2018. That album has reached number 6 on the "Billboard 200" chart, which means that it was the sixth most popular music album in the United States during the week in which it achieved that status.

A single from that album entitled "No Erasin" is currently climbing Billboard's, "Adult Contemporary"" Chart, and reached Number 18 on that chart as of November 3, 2018.

6.   I had not participated in interviews or other media activity for a number of years before I released "Traces," but I did participate in interviews on <u>CBS News Sunday Morning</u>, <u>Good Morning America</u>, and other media outlets to support my "Traces" music album.  I understand that there has been a great deal of media attention surrounding that release.

7.   I have worked hard throughout my music career to release to the public only the best music I am capable of creating.  I also have worked hard to make sure that only the best vocal performances I am able to render, and the best recordings of my music and vocal performances, are released to the public.  For creative and professional reasons, I want only the best music and vocal performances to be released under my name, and recordings of my music and vocal performances must be of the highest quality before I release them to the public.  I only release music and vocal performance that meet my standards because as a result of my efforts over my more than 40-year musical career. the public has come to expect a certain level of quality from my music and vocal performances, and I want to satisfy myself and meet the expectations of the public with the work I present to it.  In addition, the music business is so competitive that release of subpar music, subpar vocal performances, or subpar recordings could hurt my standing with the public and significantly harm my career.

8.   In about 1991, I was represented by the well-known music manager, Bob Cavallo.  Bob introduced me to a musician named Phil Brown ("Brown"), and encouraged me to work with Brown to see if worthwhile music could be created.

9.   I met with Brown at what was then his home in Sylmar, California. Brown showed me to two songs he had written, and he and I wrote two songs together.  To help me evaluate the songs, I recorded vocal performances of them on

-23-
EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

an eight track tape recorder that Brown had in the garage of his home.  I also loaned Brown about $1,500 in connection with those recordings, and we entered into an administration agreement in which Brown agreed that I would have exclusive rights for the two songs we had written as described in that agreement, so I could decide when or if those songs would be released to the public.

10.    My recordings of those four songs in Brown's garage were made only for "demo" purposes, to see if the songs, were creatively acceptable and might have the potential for future release.  Those home recordings did not have the same quality as a recording made in a proper recording studio, and while I performed those songs well enough to evaluate whether I wanted to do anything with them in the future, I did not perform them as I would have if I were recording a studio performance for public release.  I never intended those recorded vocal performances to be publicly released because I wasn't trying to create vocal performances, or recordings of my vocal performances, that were appropriate for public release, and I didn't and don't believe those recordings meet my standards for public release.

11.    I also didn't intend to publicly release those sound recordings because I was contractually required to release all of my recorded vocal performances exclusively through CBS Records, which was subsequently acquired by Sony.  I would never have recorded vocal performances in which someone other than myself or CBS (Sony) owned a copyright interest, because I always intended to comply with my recording agreement.  The terms of my recording contract with what became Sony are confidential, but attached as Exhibit A is a redacted version of that agreement, which shows true and correct copies of the provisions in that agreement that prohibited me from releasing recorded vocal performance for anyone else.

12.    I intended all of the vocal performances that I recorded at Brown's home to be solely my copyrighted work for that reason, so that I could exercise exclusive control over and prevent the unauthorized release of my vocal performances on those home recordings by others.

13.     As I mentioned above, in August 1991 I also entered into an exclusive administration agreement pursuant to which I could control exploitation of the two musical compositions, called "Somebody Somewhere" and "Don't Push the River" that Brown and I had created.  A true and correct copy of that administration agreement is attached as Exhibit B.

14.     I ultimately decided that the two songs Brown showed me, and the two songs we had worked on together, were not appropriate for public release at the time.  None of those musical compositions appeared in my 1994 solo album "For the Love of Strange Medicine," or on any other work of mine.  I don't recall doing any other work with Brown after 1991.

15.     I recall that in about January or February 2002, more than ten years after I recorded those vocal performances in Brown's home, an attorney for Brown claimed for the first time that Brown had a co-ownership interest in my vocal performances.  My lawyers sent Brown's attorney a letter rejecting that claim. Brown never took any legal action against me disputing my claim to sole copyright ownership of my recorded vocal performances. In fact, I never heard anything further from Brown until October 2018.

16.     In October 2018, shortly after my album "Traces" was released, I was told by my current manager that Brown had again begun claiming an ownership interest in the copyright in the vocal performances that had been recorded in Brown's home, and also was threatening to release those vocal performances to promote a new album Brown said he was about to release.  I also have seen copies of public Twitter messages posted by Brown's manager that prominently use my name and picture to promote Brown and a band he apparently controls called "Apaches from Paris."   You can see true and correct copies of those Twitter messages Exhibit F of the amended complaint on file herein. and concurrently filed with my declaration.

17.     I have never authorized Brown, his manager, or anyone else associated

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

with Brown to use my "Steve Perry" mark, name or likeness in this or any other commercial manner. Through my representative I have repeatedly told Brown that I object to these actions, and I have demanded that Brown cease and desist such actions. Although I have no ill will toward Brown, at this point in my career I am not and do not want to be associated with him and his professional endeavors. I also don't want my fans, or the broader public, to be misled by Brown's conduct into believing that I am associated with him, or that I have anything to do with Brown or his music when I do not. Nor do I want the public to mistakenly believe that the almost 30-year old recordings I made in Brown's garage represent the music I currently release to the public.

18.    Brown's actions in using my name and likeness to promote himself and his music harms me by causing me to lose control over the commercial value of my identity and endorsement, and diluting the value of my endorsement in a way that is real but hard to quantify. Although there are many musicians whose work I admire, and I occasionally work with other artists, I do not commercially endorse other musicians or their music. Brown's actions could cause my fans and the public to mistakenly believe that I am associated with Brown or his band, and blame me when the music Brown releases does not meet their expectations.

19.    Brown's release of the vocal performances I rendered at his home in about 1991 also could harm me and my career. I never intended those recorded vocal performances to be publicly released, and I do not want them released now. Their release to the public could harm my professional reputation, and cause fans and the broader public to blame me when those performances do not meet their expectations.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of November, at Los Angeles, California.

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

1



Stephen Perry

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-27-

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

## DECLARATION OF MARK S. LEE

I, Mark S. Lee, declare:

1.     I am a lawyer admitted to practice before of all the courts of the State of California and this Court, and am a partner at Rimon, PC, one of the counsel of record for Plaintiff Stephen Perry in this matter. I have personal knowledge of the following facts except where otherwise indicated, and if called upon as a witness, I could and would competently testify thereto.

2.     In the course of my work for clients in the music business over the past 25 years, I have become familiar with the Recording Industry Association of America or "RIAA," which for about the past 60 years has tabulated and tabulates single and album sales.  The RIAA has on its website a searchable database one can use to discover the RIAA's sales figures for bands and individual artists whose recordings have achieved what the RIAA calls "Gold," or "Platinum" status, that is, have sold at least 500,000 or 1 million copies or downloads. That database can be found at https://www.riaa.com/gold-platinum/.  On November 9, 2018, I searched that database for the band "Journey," and found a listing of all of the singles and albums sold by "Journey" that achieved Gold or Platinum status.  Attached as Exhibit H is a true and correct copy of a printout of that listing.

3.     It is possible to further search under each individual single or album listing shown on that page to discover the RIAA sales figures for that single or album.  I conducted such a search for each "Journey" entry shown on Exhibit H. Although I was not able to printout the results of each such search, apparently because of restrictions on the RIAA's website, I did tabulate the total sales figures shown on the online database, and discovered that Journey has sold about 54 million albums and singles in the U.S. according to the RIAA's sales figures.  Other online sources estimate that Journey has sold about 75 million albums worldwide.

4.     On November 7, 2018, I conducted a Google search of the name "Steve Perry."  The search turned up approximately 284 million results.  Attached hereto as

-28-

Exhibit I is a true and correct copy of the first page of those search results.

5.    On November 7, 2018, I also conducted a Google search of the terms "Steve Perry" and "Traces."  The search turned up approximately 4.8 million results.  Attached hereto as Exhibit J is a true and correct copy of the first page of those search results.

6.    I also have long been familiar with "Rolling Stone" Magazine, which for more than 40 years has reported extensively on Rock and Pop music.  In 2010," Rolling Stone" compiled and published a list of "The 100 Greatest Singers of All Time."  It posted that article, with embellishments, online at https://www.rollingstone.com/music/music-lists/100-greatest-singers-of-all-time-147019/.  Stephen Perry is ranked Number 76 on that list.  Attached as Exhibit K is a true and correct copy of Steve Perry's ranking excerpted from the "Rolling Stone" List.

7.    Widespread media reports indicate that Steve Perry is widely known as "The Voice," a title reportedly given him by rock musician Jon Bon Jovi. See, e.g., https://www.desertusa.com/dusablog/a-perry-special-story.html; http://noisecreep.com/steve-perry-journey/; https://web.archive.org/web/20160620032651/https://www.glamour.com/story/that-time-i-talked-to-steve-pe; and https://www.needsomefun.net/steve-perry-facts/.  A group of fans with which Stephen Perry is not associated hosts a Facebook page for "Steve Perry (The Voice)." See https://www.facebook.com/steveperryfan/.

8.    On or about November 7, 2018, I discovered that Phil Brown had a Facebook page he apparently maintains to promote a group he leads called "Apaches from Paris."  See  https://www.facebook.com/ApachesFromParis/.  Review of that page on November 7 revealed that Mr. Brown had posted a 35-second clip of a vocal performance of Steve Perry that had been recorded in Mr. Browns home in the early 1990s on that page. True and correct copies of two print screens which show the portion of the Facebook page on which a link to the sound

clip is attached as Exhibit G. I sent a DMCA takedown notice to Facebook demanding that the clip be removed from that Facebook page.  On or about November 8, I received a notice from Facebook that it had taken down the clip in response to that demand. Subsequent review of that Facebook page revealed that the 35 second clip is no longer posted there.  That Facebook page can be viewed at https://www.facebook.com/ApachesFromParis/.

9.     I have been involved in litigation to protect the of copyright and other intellectual rights owners on computer bulletin boards and the Internet for more than 25 years, and have seen many instances in which my clients' copyrighted works were distributed online without their permission.  An unfortunate technological reality of the Internet is that it permits the widespread distribution of unauthorized digital copies of online works with the simple click of a key on a computer keyboard.  Copies of such works can be easily distributed to thousands, or millions of users in seconds, or minutes, or hours.  That happens with many works that "go viral" on the Internet.  This technological reality means that it may be impossible to obtain effective relief by way of a noticed motion for a preliminary injunction. Thousands, or millions of unauthorized copies of copyrighted works can be distributed during the time required for the parties to brief, and this Court to rule on, such a motion.

10.     On November 12, 2018 I searched the US Patent and Trademark Office's online database of trademark registrations, and discovered a trademark registration for "Steve Perry" in the field of prerecorded music.  A true and correct copy of that registration is concurrently filed as Exhibit A.

11.     On November 12, 2018, I also conducted an Internet search which revealed that Steve Perry has a page on Facebook, and that he has posted entries on that page promoting his current "Traces" album.  See https://www.facebook.com/steveperrymusic/.

12.     In compliance with local rules, I gave Defendant notice of the present

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

application on November 13, 2018 by contacting him through every means known to me. First, I called and left a message at a telephone number Mr. Brown has listed on the Facebook page I described above, advising that our client Steve Perry had filed suit against him and was filing the present ex parte application for a temporary restraining order. We do not know who Mr. Brown's attorney is, so I also urged Mr. Brown to have his lawyer contact me about the application.  Next, we emailed the complaint and ex parte papers to two email addresses, one Mr. Brown used when he obtained the domain name "PhilBrownGuitar.com" and another used by Ms. Branda Bann, who identified herself as Phil Brown's manager in email exchanges with Mr. Perry's attorneys in connection with the present dispute.  Those emailed papers include (1) the concurrently filed First Amended Complaint, (2) the present Ex Parte Application for Temporary Restraining Order and Order to Show Cause re a Preliminary Injunction, including declarations and exhibits, and (3) the Proposed Order to Show Cause for a Preliminary Injunction with Temporary Restraining Order.  Finally, I directed that we send by overnight courier copies of the same papers to three addresses which show as current addresses for Mr. Brown on online databases.  I have not heard from Mr. Brown or his lawyer as of the time I sign this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this declaration was executed on November 13, 2018 at Los Angeles, California.

/s/ Mark S. Lee
Mark S. Lee

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

# DECLARATION OF ERIC CUSTER

I, Eric Custer, declare:

1. I am an attorney admitted to practice before this Court, and am a partner at Manatt, Phelps & Phillips, LLP, one of the counsel of record for Plaintiff Stephen Perry in this action. I have personal knowledge of the matters stated herein except for otherwise indicated, and if called upon to testify as a witness, I would and could competently testify thereto. I base that knowledge upon my participation as counsel for Stephen Perry, and upon my review of the file in preparation for this declaration.

2. In about January, 2002, an attorney named Chuck Hausman advised this office that he represented Phil Brown. He sent a letter claiming that Mr. Brown owned copyright interests in four sound recordings that featured Stephen Perry's vocal performances that had been made at Mr. Brown's home in the early 1990s. There was an exchange of correspondence between Mr. Hausman and this office concerning that issue. Attached as Exhibit D is a true and correct copy of a letter received from Mr. Hausman. Attached as Exhibit E is a responsive letter sent on or about February 7, 2002, from Barry Mallen, one of my partners at Manatt in 2002.

3. In October of this year, I was advised by Plaintiff's present manager that a woman named Brenda Bann was acting as Chris Brown's manager and claiming that Mr. Brown was planning to release the four sound recordings. I wrote Ms. Bann on October 19, 2018, and subsequently exchanged email messages with her in response to her claims. On behalf of Mr. Perry, I rejected those claims. True and correct copies of my letter and of that email correspondence is attached as Exhibit L.

4. In October 2018 I also discovered that Ms, Bann was posting Twitter messages in which she used Steve Perry's name and likeness to promote Phil Brown and a band Mr. Brown apparently leads called "Apaches from Paris." A true and correct copy of those Twitter messages is attached as Exhibit F.

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on November 13, 2018 in Los Angeles, California.

/s/Eric Custer
Eric Custer

EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER